IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOSEPH MILES,

   Plaintiff,

v.

J.R. BELL, WARDEN

   Defendant.

Civil Action No.: DKC-20-2107

## MEMORANDUM OPINION

The above-entitled action was construed as a civil rights complaint filed pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), seeking injunctive relief in connection with the conditions of confinement under which Plaintiff Joseph Miles is held at the Federal Correctional Institution at Cumberland, Maryland ("FCI-Cumberland"). This court directed counsel for Defendant to show cause why the injunctive relief pertaining to COVID-19 precautions should not be granted in favor of Mr. Miles. ECF No. 2. That response was filed on October 9, 2020, after counsel sought and was granted three extensions of time. ECF No. 11. Mr. Miles has filed a reply and surreply opposing Defendant's request that his complaint be dismissed. ECF No. 14 and 17. The issues have been fully briefed and there is no need for an evidentiary hearing. *See* Local Rule 105.6 (D. Md. 2018). For the reasons that follow, injunctive relief is denied, and the complaint shall be dismissed without prejudice.

### BACKGROUND

A.   <u>Complaint Allegations</u>

Mr. Miles is a 67-year-old inmate who has prostate cancer, diabetes, lung disease and hypertension. ECF No. 1 at 7. Mr. Miles maintains that, because of his age and underlying health conditions, if he contracts the COVID-19 virus he is likely to suffer severe illness or death. *Id*. at

6. He maintains that he has a serious medical need to reduce the risk of contracting the virus and the Bureau of Prisons ("BOP") has not done enough to reduce the risk contracting the virus poses to him. *Id*. at 7. Mr. Miles complains about the lack of testing, the failure to provide adequate personal protection equipment ("PPE"), the failure to provide adequate cleaning supplies, and overcrowding.

Mr. Miles explains that two months prior to the date he filed his complaint[1] numerous inmates and staff tested positive for COVID-19. ECF No. 1 at 8. Mr. Miles claims that, despite that development, the "Health Services Department staff at the prison refused to test any inmates for COVID-19 who did not have a temperature and display[ed] obvious symptoms of the virus." *Id*. Any inmate who had symptoms was instructed to notify Health Services, but according to Mr. Miles, all of the inmates at FCI-Cumberland are aware that "reporting illness to the medical staff will result in punitive transfer to the 'hole'" which results in an under-reporting of illness. *Id*. Mr. Miles claims that the BOP as a whole and FCI-Cumberland have "failed to test more than ten-percent of the prisoners in their care." ECF No. 1 at 8. Mr. Miles believes that, in his estimation, the failure to test asymptomatic prisoners when "most persons infected by COVID-19 are asymptomatic, is a direct threat to [his] health and is evidence of deliberate indifference to [his] serious medical need to take actions to reduce [his] risk of getting sick." *Id*. at 8-9. Mr. Miles further claims that inmates who transfer into FCI-Cumberland or who are sent out of the prison are not tested. *Id*. at 9.

Mr. Miles claims that measures to prevent the spread of COVID-19 are also inadequate. ECF No. 1 at 9. He states that inmates were not given replacement masks and many have been

---

[1] Mr. Miles' complaint is dated July 12, 2020 and is deemed filed as of that date. ECF No. 1 at 12.

forced to fashion their own masks out of fabric or repeatedly to use a disposable mask for months at a time. *Id.* Meanwhile BOP staff are provided with "fitted masks at BOP expense as needed." *Id.* Notwithstanding the staff having access to PPE, however, Mr. Miles claims he has witnessed officers "regularly remove their masks . . . [to] converse with one another." *Id.* He states that each incident is a hazard to his health and to his life. *Id.*

Inmates who do not have adequate funds to purchase soap at the commissary are not given additional soap according to Mr. Miles. ECF No. 1 at 9. Hand sanitizer is not provided to any of the prisoner population which means that inmates who use the phones, computers, showers, door handles, fountain, and other shared items, cannot sanitize their hands after doing so. *Id.*

Mr. Miles also maintains that FCI-Cumberland is "severely overcrowded" and explains that the capacity of the facility is 672 inmates, but that it currently houses 1,192 inmates. ECF No. 1 at 9-10. He states that he asked to be considered for home confinement, but his request was rejected despite his vulnerabilities should he contract COVID-19. *Id.* at 10. He concludes that allowing him to remain in an overcrowded prison during a pandemic without adequate preventative measures in place constitutes deliberate indifference to his serious medical needs; a violation of his Eighth Amendment rights. *Id.*

As relief, Mr. Miles seeks an injunction requiring the BOP to: test all inmates at FCI-Cumberland for COVID-19; issue adequate hand sanitizer, soap, and masks to all inmates each week; test incoming prisoner for COVID-19; ensure all prisoners have access to the same PPE that staff have; adequately address Mr. Miles' higher risk of severe illness or death due to his underlying medical conditions; and consider Mr. Miles for release to home confinement. ECF No. 1 at 11.

B.     Defendant's Response

Mr. Miles was sentenced by this court on February 6, 2017, to serve a term of 108 months for conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base. ECF No. 11-1 at 1, ¶ 3. His projected release date is February 6, 2023. *Id*. Mr. Miles is housed in Housing Unit C1 and he has one cellmate. *Id*. at 2, ¶ 5. Since Mr. Miles arrived in BOP custody, he has not availed himself of the administrative remedy process. *Id*. at 2, ¶ 6.

The BOP has implemented national measures to address the threat presented by COVID-19 and those measures have been put into place at FCI-Cumberland. ECF No. 11-1 at 2, ¶ 7, citing https://www.bop.gov/coronavirus/. One of the measures implemented is the requirement that staff and inmates must wear masks at all times with the only exception being when inmates are in their assigned cells. *Id*. at ¶ 8. When arriving to work, staff are screened for symptoms and for temperatures before they may enter the institution. *Id*. at ¶ 9. Health Services staff screen any inmates leaving for a work detail before they leave their assigned unit. *Id*. at ¶ 10. Further, the entire inmate population is "being screened every Monday, Wednesday, and Friday" which includes taking the inmates' temperatures. *Id*. at ¶ 11.

Inmates exhibiting symptoms of COVID-19 are isolated in the Health Services Unit where the staff provide 24-hour coverage. ECF No. 11-1 at 2, ¶ 12. Symptomatic inmates are moved to the isolation room in Health Services immediately where they are examined by a provider and lab work is conducted. *Id*. at 3, ¶ 13. Inmates who test positive for the virus are required to remain in isolation for 28 days and may not be released until they test negative. *Id*. at ¶ 14. Inmates who are asymptomatic but require quarantine, *e.g*., prior to release or during contact investigation, are housed together in a specific unit in the prison. *Id*. at 2, ¶ 12.

At the beginning of the pandemic each inmate received two masks. *Id*. at 3, ¶ 15. Replacement masks are available through the Unit Team and may also be purchased from the commissary. *Id*. "Three-hundred (300) units of soap[2] are distributed to every unit on a weekly basis." *Id*. at ¶ 16. Each of the housing units in the prison holds a maximum capacity of 128 inmates. *Id*. Shared devices like telephones and computers are cleaned after each use with disinfectant chemical cleaners by unit orderlies. *Id*. at ¶ 17. Temperature checks are performed on each inmate twice a week and if an inmate has a temperature of 99 degrees or higher, he is referred for further screening by Health Services staff. *Id*. at ¶ 18.

Movement within the prison is limited by allowing only one tier of inmates in a housing unit out of their cells at a time. ECF No. 11-1 at 3, ¶ 19. The maximum number of inmates out of their cells at any given time is 68 and no more than 100 inmates are allowed out for outside recreation at any given time. *Id*.

BOP guidelines for visitation at FCI-Cumberland as of October 3, 2020, limit visits to one housing unit on a rotating schedule and require both visitors and inmates to wear face coverings at all times. *See* https://www.bop.gov/locations/institutions/cum/ (Special Visiting Procedures) (last visited Dec. 8, 2020). The number of visitors allowed in the visiting room is limited to three visitors for each inmate at one time. *Id*. No physical contact is permitted between the visitors and the inmate and no photographs are permitted because social distancing is enforced. *Id*. Visitation stations spaced six-feet apart are set up in the Visiting Rooms and inmates and visitors are not allowed to move from the station with the exception of going to the restroom. *Id*. Violation of any of the procedures in place results in termination of the visit. *Id*.

---

[2]   Defendant does not define what constitutes a "unit of soap."

As of December 8, 2020, there are 200 inmates and 11 staff members at FCI-Cumberland who have tested positive for the virus. Bureau-wide there have been 83,165 tests completed on inmates; 3,874 tests of inmates that are pending; and 26,361 inmates who tested positive for COVID-19. *See* https://www.bop.gov/coronavirus/ (last visited Dec. 8, 2020).

## STANDARD OF REVIEW

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), *see also SAS Institute, Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be."). "If a less drastic remedy . . . [is] sufficient to redress . . . [an] injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted." *Monsanto Co.*, 561 U.S. at 166 citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 31-33 (2008).

A party seeking a preliminary injunction or temporary restraining order must establish the following elements:  (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter*, 555 U.S. at 20; *The Real Truth About Obama, Inc. v. Federal Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). A preliminary injunction is distinguished from a temporary restraining order ("TRO") only by the difference in notice to the

6

nonmoving party and by the duration of the injunction.  *U.S. Dep't of Labor v. Wolf Run Mining Co.,* 452 F.3d 275, 281 n.1 (4th Cir. 2006) (comparing Fed. R. Civ. P. 65(a) with Fed. R. Civ. P. 65(b)).  A preliminary injunction cannot issue without notice to the nonmovant.  *See* Fed. R. Civ. P. 65(a)(1).

## ANALYSIS

Defendant's argument why injunctive relief is not warranted focuses on the likelihood of success prong.  ECF No. 11.  Defendant raises the affirmative defense that Mr. Miles has failed to exhaust administrative remedies.  If Mr. Miles' claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e.  The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."  42 U.S.C. §1997e(h); *see also Gibbs v. Bureau of Prisons*, 986 F. Supp. 941, 943-44 (D. Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process).  The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D. Md. 2003), *aff'd*, 98 Fed. Appx. 253 (4th Cir. 2004).

Administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Nevertheless, a claim that has not been exhausted may not be considered by this court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original).

The BOP has established an Administrative Remedy Program for inmates to resolve concerns related to their confinement. *See* 28 C.F.R. § 542.10 *et seq*. Inmates must first attempt informal resolution with staff. *See* 28 C.F.R. § 542.13. If an inmate is unable to resolve his complaint informally, he may file a formal written complaint on the proper form within twenty

calendar days of the date of the occurrence on which the complaint is based.  *See* 28 C.F.R. §542.14(a).  If an inmate is not satisfied with the Warden's response to the formal complaint, he may appeal, using the appropriate form, to the Regional Director within twenty calendar days of the Warden's response.  *See* 28 C.F.R. § 542.15(a).  If the inmate is still dissatisfied, he may appeal the Regional Director's response to the Office of the General Counsel, located in the BOP Central Office in Washington, D.C., using the appropriate form.  The inmate must file this final appeal within thirty calendar days of the date the Regional Director signed the response.  *See id*.  An inmate is not deemed to have exhausted his administrative remedies until he has pursued his grievance through all levels.  *See* 28 C.F.R. § 542.15(a).

Mr. Miles' claims focus on the practices in place at FCI-Cumberland rather than the policies and procedures mandated by the BOP.  In his response to Defendant's assertion that he is not entitled to injunctive relief, Mr. Miles does not deny that he failed to exhaust administrative remedies.  Rather, he claims to have witnessed numerous instances when the policies developed to protect both staff and inmates were violated or ignored.  ECF No. 14-2 at 5-6 (Affidavit of Joseph Miles).  Additionally, he attaches a May 4, 2020, letter sent to Attorney General William Barr by Senators Benjamin L Cardin and Chris Van Hollen urging the "swift implementation" of measures to increase the amount of time that at-risk individuals could be placed in home confinement and to consider treating federal correctional officers as "federal law enforcement officers" so that they may be provided with the same protections.  ECF No. 14-3 at 3.  Mr. Miles also provides statements from other inmates in support of his Surreply indicating that the national measures issued in response to the pandemic are not being enforced at FCI Cumberland.  ECF No. 17.

One of the many purposes of requiring inmates to exhaust administrative remedies is to provide prison officials with an opportunity to correct problems that exist within the institution before the matter is brought to the court for resolution.  *See Bock*, 549 U.S. at 219 (purpose of exhaustion includes "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record.").  Mr. Miles did not do this, leaving officials at FCI-Cumberland in the unenviable position of attempting to defend against accusations that policies and procedures are not being followed by unnamed individuals on unknown dates and under unknown circumstances.  Further, the remedy sought by Mr. Miles seemingly prevails upon this court to enforce the procedures already in place or, at the very least, to monitor the management of the prison to ensure corrective actions are taken.  This type of judicial involvement in the day-to-day management of correctional facilities is unwarranted where, as here, there is no evidence of any intentional imposition of unconstitutional conditions.  *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (courts must defer to the expertise of prison officials).  In short, the drastic and extraordinary remedy of an injunction is unwarranted under the circumstances of this case.  Mr. Miles is unlikely to succeed on the merits of his claim as he has failed to exhaust administrative remedies.

By separate Order which follows, the complaint shall be dismissed without prejudice.


January 22, 2021                             /s/
                                    DEBORAH K. CHASANOW
                                    United States District Judge